**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
at COVINGTON**


**CIVIL ACTION NO. 05-148-DLB**

**JAMES R. TURNER, ET AL.**                                                      **PLAINTIFFS**


**vs.**                                            **OPINION & ORDER**[1]


**GRANT COUNTY DETENTION CENTER, ET AL.**                        **DEFENDANTS**



\* \* \* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court on pending motions; namely, Plaintiffs' Renewed Motion for Class Certification (Doc. #161) and the Grant County Defendants'[2] Motion to Dismiss, or in the Alternative for Summary Judgment (Doc. #163). The Court has reviewed the parties' filings, and a lengthy oral argument was held on these motions on March 18, 2008. Having heard from counsel, for the reasons discussed at oral argument and/or as explained hereinbelow, Defendants' Motion to Dismiss will be **granted in part** and **denied in all other respects,** and Plaintiffs' Renewed Motion for Class Certification will be **denied.**

---

[1]Pursuant to the E-Government Act of 2002, this is a written Opinion and therefore is available electronically. However, it has been entered only to decide the motions addressed herein and is not intended for official publication or to serve as precedent.

[2]Defendants Grant County Detention Center, Grant County Fiscal Court, Jailer Steven L. Kellam, individually and in his official capacity as Jailer of the Grant County Detention Center, and unknown staff members of the Grant County Detention Center are collectively referred to herein as the "Grant County Defendants."

## Background

This case originated with the July 26, 2005, filing of a Class Action Complaint by Plaintiffs James Turner and Larri Brown against Defendant Grant County Detention Center and others associated with running the Detention Center.  Operations at the facility have been the subject of several other actions before this Court.[3]  In general terms, the plaintiffs in those cases asserted that they were subjected to cruel and unusual punishment in the form of physical assault by either Detention Center employees or other inmates under circumstances where employees knew or should have foreseen that the attack would occur.  Many of the actions also alleged that after sustaining injury, they were denied reasonably needed medical care or denied it in a timely manner.  These cases were amicably resolved via extensive mediation efforts of the parties and the assigned Magistrate Judge.  Counsel that represented several of those individual plaintiffs also initiated the within class action proceeding.

Questions like those raised by the allegations in the prior multiple filings were also the subject of an investigation by the Department of Justice.  The Department conducted a three-day on-site visit of the Detention Center in February of 2004, and at the close of that visit shared their preliminary findings with the Jailer.  The formal Department report was issued in May of 2005.  (*See* Doc. #161, Plaintiffs' Renewed Motion for Class Certification, Ex. A).  The Department investigation has more recently given rise to a

---

[3]Persons housed at the Detention Center who previously filed individual lawsuits here in the Eastern District of Kentucky, Covington Division, for alleged constitutional deprivations are Joshua Sester (03-cv-66), John Taylor (03-cv-103), Todd Cox (03-cv-105), Matthew Hedger (03-cv-108), Billy Jo Killian (03-cv-124), the Estate of George Overby (03-cv-171), Roy Cobb (04-cv-129), and Benjamin Morris (04-cv-166).

criminal indictment alleging civil rights violations against certain individuals employed at the Detention Center at the time of the investigation.[4]

While the prior proceedings against the Detention Center have been prosecuted via individual cases, this action seeks class certification.  The path to certification has been tumultuous.  There have been three amended complaints; the addition of various parties – both Plaintiffs and Defendants; the dismissal of various parties – both Plaintiffs and Defendants; efforts to change venue; threshold motions; a court-imposed case schedule after the parties were unable to agree; an initial extension to seek class certification; the addition of Plaintiffs' co-counsel, who is experienced in class prison litigation; an initial class certification motion with extensive briefing, which motion at April 26, 2007, hearing was denied without prejudice as withdrawn; Plaintiffs' filing of an Amended Complaint to present a "no narcotics" class, with a renewed class certification motion filed shortly thereafter; a contemporaneously filed motion to dismiss by Defendants; extensive briefing on the class certification and dismissal motions; and, finally, the continuation of discovery and various discovery motions and extensions thereof until ultimately an agreed order was entered to stay further discovery proceedings pending the Court's adjudication of the dismissal and class certification motions.

Through the course of the above proceedings, Plaintiffs' class action suit has evolved from its initial presentation.  At this point, Plaintiffs' renewed motion seeks certification under Federal Civil Rules 23(b)(1), (b)(2), and (b)(3) of the following two classes:

---

[4] *See* Covington Criminal Action No. 08-cr-5, *United States v. Clinton Shawn Sydnor, Wesley Lanham, and Shawn Freeman.*  This action is presently scheduled for trial starting May 13, 2008.

(1)     All persons, since July 27, 2004, whom Defendants failed to protect
        from inmate assaults, threats, or the wanton and unnecessary
        infliction of physical and emotional pain and suffering as a
        consequence of Defendants' failure to properly classify such persons
        on admission to the Jail, or to protect them once admitted; and,

(2)     All persons, since July 27, 2004, to whose medical needs Defendants
        were deliberately indifferent as a consequence of Defendants' policy
        of prohibiting and refusing to provide to inmates narcotics lawfully
        prescribed by duly licensed treating physicians, and/or necessary to
        effectively treat known medical conditions and/or injuries.

As noted, Defendants have also moved to dismiss various aspects of Plaintiffs' case or in the alternative for summary judgment. While acknowledging that summary judgment prior to addressing class certification is procedurally atypical, they submit that in this case consideration of such a request is appropriate. The Court agrees. *See Miami Univ. Wrestling Club v. Miami Univ.,* 302 F.3d 608, 616 (6th Cir. 2002) (Federal Civil Rule 23 does not obligate district court to rule on class certification motion before considering merits). Because Defendants' motion seeks to clarify the state of the parties and timing issues for purposes of considering the class certification motion, and because Defendants' exhaustion argument, if applicable, impacts consideration of class certification, the Court turns first to Defendants' motion.

## Analysis

### A.    Motion to Dismiss, or in the Alternative for Summary Judgment

Defendants present several points in their motion. Each of these arguments is considered in turn.

### 1.    Claims Barred by Statutes of Limitations

Defendants seek to clarify those Named Plaintiffs whose claims are barred by the statute of limitations. They submit that Plaintiffs Brian Fornash, James Cormican, Odas

Cutlip, and Sean Raines each have claims that are so barred and they therefore should be dismissed from this action.  In response, Plaintiffs do not contest that the claims of Plaintiffs Cormican, Cutlip, and Raines should be dismissed as outside the applicable limitations period and, accordingly, the Court will so order.  But as to the claims of Fornash, Plaintiffs initially responded that his claims arose from his incarceration at the Detention Center in April of 2006 and so were not time barred.  However, the claims of Plaintiff Fornash have since been dismissed by Agreed Order of Dismissal. (*See* Doc. #191).  Finally, Defendants also argue that the claims of Plaintiff Carl Stophlett are based upon a 2001 incarceration and so outside the time period.  In response, Plaintiffs simply note that the claims of Stophlett were previously dismissed by Agreed Order of Dismissal of May 14, 2007. (*See* Doc. #157).

Defendants further seek to clarify the time frame applicable to the putative class. They submit the proposed class definition does not make clear that it is for the time period from and after July 27, 2004, one year before the initial Complaint was filed, and so they request the Court order that any claims arising from conduct, acts, and incidents occurring prior to July 27, 2004, should be dismissed.  They also seek to have the Named Plaintiffs identify what pre-July 27, 2004, incidents they rely upon so that these may be dismissed as well.

In their Response, Plaintiffs indicate that they do not contest the defense's argument that claims based upon incidents at the Detention Center prior to July 27, 2004, are time barred.  Indeed, Plaintiffs' renewed certification motion clearly states that Plaintiffs propose two classes, each starting from July 27, 2004, as far as persons to be included.  Of course, *claims* arising from pre-July 27, 2004, incidents as time barred should be distinguished from

use of pre-July 27, 2004, incidents as *evidence* in support of liability determinations. The latter is an admissibility issue which is not presently before the Court or pertinent to the pending dismissal motion, a point acknowledged by Defendants at oral argument.

### 2.    Relation-Back of "No Narcotics" Policy

Plaintiffs filed their Third Amended Complaint on May 7, 2007. In it, they for the first time included a proposed class of persons denied narcotic medication as a result of a "no narcotics" policy of the Detention Center. In their motion, Defendants' contend that the addition of this formal claim of a "no narcotics" policy and proposed class relating thereto does not relate back to the July 26, 2005, filing date of the original Complaint. They note that the first mention of this topic was in late January of 2007, when Plaintiff John Teegarden filed a request for injunctive relief alleging he had been improperly denied his medications. Defendants point out there was at that time no mention of a class-wide claim for such being asserted. They submit that it was instead first raised at the April, 2007, oral argument in response to the impending denial of Plaintiffs' initial motion to certify. Defendants maintain that there has been undue delay in the filing of this claim that, in turn, has interfered with the discovery timeline because some Named Plaintiffs who are allegedly victims of this policy have already been deposed. They therefore submit that any claims prior to May 8, 2006, one year prior to the filing of the Third Amended Complaint asserting the "no narcotics policy," should be time barred. Moreover, they maintain that none of the Named Plaintiffs has such a claim arising after May 8, 2006, and therefore this claim must be dismissed in its entirety.

Plaintiffs, of course, disagree. They argue the claim of a "no narcotics" policy relates back to July 26, 2005, because the civil rules require only that the amendment assert a

claim that arises "out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading[.]" Fed. R. Civ. P. 15(c)(1)(B).  Therefore, adding allegations or even a new legal theory relates back, as long as this standard is satisfied. They maintained in briefing and initially at oral argument that this standard was satisfied because their original Complaint alleged that the Defendants had violated the Plaintiffs' rights to receive medical care by failing to dispense proper medication and treat existing or new medical conditions or injuries. (*See* Doc. #1, at ¶ 13).  They further note that their Complaint alleged that inmates already under specific medications upon admission to the Detention Center were not given those medications and other inmates were denied needed medications. (*See id.* at ¶ 26).  Plaintiffs argue this was enough to put Defendants on notice that the manner in which prescription medication was being authorized and dispensed at the Detention Center was being challenged.

The Detention Center's process of handling medications within the facility was indeed raised and discussed at the April 26, 2007, oral argument.  The Court at that time ruled that Plaintiffs would be permitted to file a Third Amended Complaint addressing the "no narcotics" policy (*see* Doc. #170, at p. 69), but that the certification motion should be withdrawn with a renewed certification motion to be filed shortly after that amendment.  No particularized objections to the filing of that Third Amended Complaint were raised by Defendants at oral argument, negating Defendant's present contentions that are in the nature of objections to that amended filing; i.e., undue delay or prejudice to Defendants by the amendment's impact on discovery.

Moreover, Defendants' contention that relation back to the original filing date is not appropriate due to Plaintiffs' failure to reference in earlier filings or discovery that it was

specifically a jail policy or procedure Plaintiffs were challenging is unsound.  Rule 15 requires simply that amendment arise from the same "conduct, transaction, or occurrence," and as Defendants acknowledged at oral argument, Rule 15 is liberally applied.  Defendants' conduct in assessing and dispensing appropriate medications generally was at issue from Plaintiffs' initiation of this proceeding, regardless of whether they at that time had knowledge of or made reference to a formal policy or procedure of the Detention Center.

Ordinarily, were this the extent of the circumstances, Plaintiffs' legal position on this issue would prevail.  However, Defendants correctly point out that relation back of claims applies only to parties then existing at the relation-back date;[5] in other words, parties added at a later date and asserting the claim do not receive the benefit of an earlier assertion date of that claim for statute of limitations purposes.  In light of this fact, any relation back asserting such "no narcotics" policy claim to the original filing date is limited to Plaintiffs James Turner and Larri Brown, the only persons named as Plaintiffs at that time.

In their renewed certification motion, Plaintiffs identify which Plaintiffs are asserting which class claims.  Larri Brown is included among those asserting representation for the "no narcotics" policy class.  However, at oral argument the Court raised an issue footnoted by Defendants – the bankruptcy filing status of Larri Brown.  After discussion, Plaintiffs' counsel conceded at oral argument that, because of the ownership status of her claims in

---

[5]Plaintiffs' Third Amended Complaint did not add any additional persons as Named Plaintiffs. And, in point of fact, in substance neither did the Second Amended Complaint. (Doc. #72).  It was the First Amended Complaint, filed April 28, 2006 (Doc. #40), which added several Named Plaintiffs to the action.  The Second Amended Complaint, filed October 5, 2006, added John Nelson Taylor as a Named Plaintiff, but this addition was for purposes of correction only, Mr. Taylor having been referenced in the First Amended Complaint but not actually identified by name in the caption.

light of the bankruptcy, Brown could not serve as a class representative.   Further discussion of the applicable date for relation back of the "no narcotics" policy claim nevertheless initially seemed unnecessary, as James Turner was identified as a representative Plaintiff.  However, upon further reflection it was noted that Plaintiff Turner was not identified by Plaintiffs' counsel in briefing as among those persons seeking to serve in a representative capacity for this class claim, a point conceded by counsel at oral argument.  Thus, neither of the persons identified in the original Complaint are serving as class representatives.  Accordingly, the claim pertaining to the "no narcotics" policy would relate back to the April 28, 2006, filing of the First Amended Complaint, when all of the other Plaintiffs were added, and would have a limitations period one year prior thereto, or April 28, 2005.

### 3.    Exhaustion of Administrative Remedies

The remaining issue raised in Defendants' dispositive filing is an interesting one.  Simply put, are Plaintiffs required by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a),[6] to have exhausted their administrative remedies before filing suit in federal district court?

As both sides note in their filings, any purported defect in Plaintiffs' complaint filings by failing to allege exhaustion is no longer dispositive given the Supreme Court's recent decision in *Jones v. Brock,* 127 S. Ct. 910 (2007).  The Court therein clarified that "failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Id.* at 921.  Defendants in

---

[6]The statute provides that "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

this case have consistently raised failure to exhaust as an affirmative defense, and now move for specific consideration of that defense.

Defendants maintain that now that the defense has been presented, Plaintiffs carry the burden of establishing that they have exhausted their administrative remedies under the PLRA. Plaintiffs disagree, arguing that as an affirmative defense, it is Defendants, not Plaintiffs, who carry the burden of proof, and that they have not sustained their burden. Defendants do indeed carry the burden of proving this affirmative defense. *See Kramer v. Wilkinson,* 226 Fed. Appx. 461, 462 (6th Cir. 2007) (unpublished).

Named Plaintiffs submit that they are not required to exhaust under the PLRA because exhaustion applies only to plaintiffs who are prisoners at the time of filing, whereas none of the Named Plaintiffs herein were incarcerated at the Detention Center when suit was filed. In support of this argument, Plaintiffs rely upon a lower court decision from within this district, *Smith v. Franklin Co.,* 227 F. Supp. 2d 667 (E.D. Ky. 2002). In filings on the issue Defendants initially disagreed, arguing that no Supreme Court or Sixth Circuit case has held that the grievance exhaustion requirement applies only to current prisoners. However, at oral argument Defendants represented that they now accept the holding in *Smith* as resolving the issue. Indeed, while the Sixth Circuit has not been confronted with the issue, every other circuit called upon to address the point has answered it as did *Smith. See Mabry v. Freeman,* 489 F. Supp. 2d 782, 785-86 (E.D. Mich. 2007) (gathering circuit decisions).

While Defendants accept *Smith's* holding, nevertheless they dispute that none of the Named Plaintiffs was incarcerated at the time of filing and therefore not required to exhaust. Defendants point to James Turner, Bobbi Riggs Gibson, and Alan Taylor as

Plaintiffs who were incarcerated at the time of filing.  But while Defendants disputed Plaintiff Turner's dates of incarceration in motion filings, at oral argument it seems this is now a moot point, as documents reflect a May 23, 2005, release date for Turner, two months before he filed the initial Complaint.

As for Alan Taylor and Bobbi Riggs Gibson, both added as Named Plaintiffs by the First Amended Complaint filed April 28, 2006, Defendants submit these individuals were incarcerated at the time of filing and so were required to exhaust administrative remedies under the PLRA before suing.  However, the examination of the dates of incarceration for these individuals evidences that they were housed at the Detention Center at the time the *original* Complaint was filed.  For purposes of determining whether the PLRA applies to them, Taylor and Gibson "brought" their action on April 28, 2006, when they were added as Named Plaintiffs.  *See Cox v. Mayer,* 332 F.3d 422, 424 & n.1 (6th Cir. 2003) (noting that "to bring" under the statute means to file).  According to the dates supplied by Defendants at argument, neither Taylor nor Gibson was incarcerated on this date.  For the Court to utilize a July 26, 2005, date against which to assess their incarceration status essentially amounts to a "relation back" of an added party plaintiff for filing purposes, something this Court does not consider self-evident, nor have Defendants pointed out authority finding this to be axiomatic.

This then leads to the question of whether exhaustion is required of putative class members who are currently incarcerated or, as another court has framed the issue, "whether the PLRA bars the claims asserted on behalf of current prisoners in a class action by Plaintiffs who are former prisoners." *Sutton v. Hopkins County, Ky.,* 2007 WL 119892, *9 (W.D. Ky. Jan. 11, 2007) (unpublished).  Plaintiffs, citing *Gates v. Cook,* 376 F.3d 323

(5th Cir. 2004), note that "vicarious exhaustion" has been applied in the class action context.  That is, any exhaustion requirement of putative class members is vicariously satisfied via a named plaintiff having exhausted administrative remedies required by the PLRA.  The Court's research reveals that at least a few other courts have also applied "vicarious exhaustion" in class action lawsuits, under the theory that the PLRA policy of providing prison officials with notice of a claim and an opportunity to address it has been fulfilled by the named plaintiff's exhaustion.  *See Meisberger v. Donahue,* 245 F.R.D. 627, 629 (S.D. Ind. 2007) and *Flynn v. Doyle,* 2007 WL 805788, *7 (E.D. Wis.) (unpublished) (both collecting cases).

However, the situation at hand would require the Court to apply "vicarious *non*-exhaustion."  Plaintiffs submit this is merely an extension of *Gates.*  They suggest that just as the PLRA's policy of providing prison officials with notice of a claim was accomplished via the named plaintiff's filing and it made no practical sense to require putative class members to have to present the same issue, so too is notice of a claim provided to prison officials here via the Named Plaintiffs' filing of their lawsuit, and that it makes no practical sense to require putative class members to afford prison officials notice and an opportunity to administratively address a claim already the subject of a lawsuit.

In the Court's view, the extension of *Gates* to the facts herein is neither simple nor obvious.  Case law suggests that the filing standards set forth in the PLRA should not be cavalierly set aside.  "'[The Court] will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise'" and evidenced an intention to eliminate a "courts' discretion to excuse exhaustion when it would not be 'appropriate and in the interests of justice.'" *Cox v. Mayer,* 332 F.3d at 427-28 (quoting

-12-

*Booth v. Churner,* 532 U.S. 731, 741 n.6, 740 n.5 (2001)).  Rather, precise adherence to what might otherwise be viewed as the Act's more exacting requirements appears to be the order of the day.  *See id.* at 425-27 (the exhaustion statute "is to be applied as written," as it is free from ambiguity, and noting that the Supreme Court and Sixth Circuit have "declined to carve out exceptions to the plain language of § 1997e(a)."). Defendants so contend, and argue that current inmates do not benefit from "vicarious exhaustion" because there, in fact, has been no exhaustion by any of the named Plaintiffs; therefore, current inmates cannot be putative class members because they have not satisfied the PLRA's exhaustion requirement.  On the other hand, this more technical application of the PLRA arguably cuts both ways.  For as Plaintiffs pointed out at oral argument, a current inmate has not "brought" or filed suit, as the term is commonly understood, but is instead a member of a putative class of persons.

While the question may be a legally intriguing one, it is also one not necessary for the Court to resolve.  In *Sutton,* the Western District of Kentucky noted that the issue is purely a question of law that would need to be resolved at some point in the litigation but not at that particular point in the proceedings.  *Sutton,* 2007 WL 119892, *9.  More importantly, for the case at bar the issue now becomes moot, given the Court's conclusions on class certification, to which the Court now turns its attention.

### B.  Renewed Motion for Class Certification

As noted above, Plaintiffs now propose certification of two classes.  For ease of reference, they will be referred to as either the "failure to protect" or "no narcotics" class. Plaintiffs have identified the following as the Named Plaintiffs for each proposed class:

"Failure to Protect" – Vanessa Berry, Larri Brown (post oral argument, now individual claim only), Jasmine Davis, Timothy Dowell, Dennis Stephens, Tonya Sunbom, and James Turner

"No Narcotics" – Larri Brown (post oral argument, now individual claim only), Timothy Dowell, George Foltz, Bobbi Riggs Gibson, Dennis Stephens, Tonya Sunbom, Alan Taylor, and John Teegarden

### 1.    Overview of Federal Civil Rule 23 and General Considerations in Reviewing Class Certification Requests

Before the Court may certify a class action, Plaintiffs' proposed classes must first satisfy the four threshold requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation.  If each of these four prerequisites is established for each class, Plaintiffs must then show that each class can be maintained under one of the theories available under Rule 23(b).  *Senter v. Gen. Motors Corp.,* 532 F.2d 511, 522 (6th Cir. 1976), *cert. denied,* 429 U.S. 870 (1976).  The burden of establishing all of the necessary requirements rests on the party seeking class certification.  *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1086 (6th Cir. 1996) (hereafter cited as *In re AMS*).

Federal district courts have broad discretion in determining whether class certification is appropriate.  *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1197 (6th Cir. 1988).  However, the Supreme Court has made clear that, when faced with a motion for class certification, district courts should conduct a "rigorous analysis" of the Rule 23 factors, *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147 (1982), with the burden of pointing out a sufficient basis for sustaining a motion for class certification borne by plaintiff, *Senter v. General Motors Corp.,* 532 F.2d 511, 522 (6th Cir. 1976).

What type of and how much evidence is needed for adequate review of a class certification motion is less clear.  On one hand, "a trial court may not inquire into the merits of a claim."  *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78 (1974).  "On the other

hand, a trial court is not artificially limited in its analysis to the pleadings, but must take the substantive allegations of the complaint as true while considering the range of proof necessary to establish those allegations." *Tucker v. Union Underwear Co., Inc.,* 144 F.R.D. 325, 326-27 (W.D. Ky. 1992) (referencing *Falcon,* 457 U.S. at 160).

### 2.    Class Definitions

The "rigorous analysis" of the Rule 23(a) factors notwithstanding, inherent in any proposed class action is that there is a "class." 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1760 (3d ed. 2006). This Court must first examine whether precisely defined classes exist and then examine whether the Named Plaintiffs are members of those proposed classes. *See East Texas Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977) (discussing membership in a proposed class).

Class definitions are unique to each case; however, important elements of defining a class include: (1) specifying a particular group that was harmed during a particular time frame, in a particular location, in a particular way; and (2) facilitating a court's ability to ascertain its membership in some objective manner. *Id.; Crosby v. Social Sec. Admin.,* 796 F.2d 576, 580 (1st Cir. 1986). "The class definition identifies the persons who are entitled to notice under Rule 23(b)(3)." Wright & Miller, *supra,* § 1760. "In order to determine whether a class action is proper, the district court must determine whether a class exists and if so what it includes. Although not specifically mentioned in the rule, the definition of the class is an essential prerequisite to maintaining a class action." *Roman v. ESB, Inc.,* 550 F.2d 1343, 1348 (4th Cir. 1976).

Defendants assert here that the definitions for both groups are deficient because membership in each putative class cannot be readily determined. Through the course of

-15-

these proceedings Plaintiffs have sought to modify their proposed class definitions to shore up preliminary confusions. However, despite these efforts, the Court is compelled to agree that the proposed definitions are unworkable.

With respect to the "failure to protect" class,[7] the proposed definition is over-broad. As Defendants point out, the wording as proposed means corrections officers who are assaulted could be members. Moreover, would an alleged failure to properly classify be applicable to every class member, to only the alleged assailant, or to both? Would an individual be a class member based upon an alleged failure to protect them once admitted, regardless of classification? In addition, in order to determine if one fell within the class, whether each inmate was assaulted, or threatened, or experienced infliction of physical and emotional pain would have to be determined. And once these persons were identified, further inquiry would be needed to assess whether arguably such assault, threat, or infliction occurred because Defendants failed to properly classify the person on admission or because Defendants failed to properly protect the inmate once admitted.

Membership in the putative "failure to protect" class could not readily be determined. The definition is not a simple formulation – these persons are, and these persons are not. The definition could include persons who have not been, and will not be, harmed by Defendants. Inmates could be included that had suffered one of these enumerated harms, though the harm was not due to Defendants' alleged illegal policies and/or practices on classification or protecting inmates.

_____

[7]Again, that class as presently defined would consist of:
All persons, since July 27, 2004, "whom Defendants failed to protect from inmate assaults, threats, or the wanton and unnecessary infliction of physical and emotional pain and suffering as a consequence of Defendants' failure to properly classify such persons on admission to the Jail, or to protect them once admitted."

Such questions and considerations, in addition to being very broad (such as what constitutes an assault, a threat, or infliction of physical and emotional pain actionable under this class definition), are also highly individualized.  Indeed, Defendants explain that classifying a prisoner would require examining for each individual his criminal history, intake forms, and information from any other source available upon intake, and then comparing this information to assessment criteria.  Failing to protect an inmate would require an assessment of that individual's circumstances of incarceration and, for example, whether there exist at the Detention Center or should have existed policies that could have protected the individual under the circumstances presented.  These type of fact-specific, individualized assessment requirements dictate against an acceptable, workable definition of a "failure to protect" class.  *See Chaffee v. Johnson,* 229 F. Supp. 445, 448 (S.D. Miss. 1964), *aff'd,* 352 F.2d 514 (5th Cir. 1965), *cert. denied,* 384 U.S. 956 (1966) ("the members of a class must be capable of definite identification as being either in or out of it").

While the "no narcotics" class[8] does not suffer definitional infirmities to the same extent as the "failure to protect" class, its proposed definition nevertheless is also problematic.  The definition is vague in that it is unclear whether the class is comprised of: (1) persons to whom narcotics prescribed by an outside physician were prohibited and refused due to a policy of Defendants, or (2) persons to whom narcotics prescribed by an outside physician and also determined by Detention Center medical personnel to be effective to treat a medical condition or injury (which would involve a medical judgment)

---

[8]Again, the proposed definition for that class is:
All persons "to whose medical needs Defendants were deliberately indifferent as a consequence of Defendants' policy of prohibiting and refusing to provide to inmates narcotics lawfully prescribed by duly licensed treating physicians, and/or necessary to effectively treat known medical conditions and/or injuries."

were nevertheless prohibited and refused due to a policy of Defendants, or (3) persons to whom narcotics necessary to effectively treat a medical condition or injury (again involving a medical judgment) were not prescribed and instead prohibited and refused by Detention Center medical personnel, or whether the class is comprised of all three groups. Groups 2 and 3 (and perhaps Group 1 as well) would require highly individualized, detailed assessments to determine class membership. *See Chaffee,* 229 F. Supp. at 448 ("[t]he vague and indefinite description of the purported class depends upon the state of mind of a particular individual, rendering it difficult, if not impossible, to determine whether any given individual is within or without the alleged class"); *see also Newton v. Southern Wood Piedmont Co.,* 163 F.R.D. 625 (S.D. Ga. 1995), *aff'd*, 95 F.3d 59 (11th Cir. 1996)(class based on medical problems from alleged chemical exposure sought, but court noted that a medical diagnosis of each proposed class member was required to identify the putative). Thus, if this were to remain the class definition it too, like the "failure to protect" class, would be rejected.

Perhaps now recognizing this dilemma, Plaintiffs' reply filings suggest their proposed "no narcotics" class definition could be modified by excising the latter portion, and thereby limit the class to those inmates already in possession of lawfully prescribed narcotics, but prohibited from receiving narcotics at the Detention Center despite their lawful prescription. Granted, such a modification would assist in eliminating the concerns about medical judgments being necessary to determine class membership. And the Court is mindful that "Rule 23(c)(4) empowers courts to define an appropriate class, whether by accepting the proposed class, limiting the class to certain issues, or creating subclasses. Thus, a complaint's proposed class definition does not bind the court, and Rule 23(c)(4) provides

[the court] with some latitude in redefining the class." 5 James Wm. Moore, et al., *Moore's Federal Practice* § 23.05[3] (3d ed. 1997). This principle is supported by the Sixth Circuit's recent affirmance in *Powers v. Hamilton Co. Public Defender Comm'n,* 501 F.3d 592, 619 (6th Cir. 2007) (citing to other circuits recognizing that litigants and judges may modify class definitions). However, the case history indicates Plaintiffs have been given opportunities and sufficient time to refine and present their proposed classes. Moreover, modification of this definition consequently raises numerosity concerns as discussed subsequently, and the Court is not persuaded that refining the "no narcotics" class definition would accomplish the goal of saving this proposed class.

Defining a "no narcotics" class is further complicated by the fact that Defendants maintain that there is no blanket "no narcotics" policy. Rather, the language of the written policy (*see* exhibit to Doc. #196) states that certain narcotic medications are generally prohibited, for various reasons as explained by the Detention Center in its response. However, according to Defendants, narcotics will be prescribed if needed and if there are no viable alternatives. This possibility is apparently why Plaintiffs abandoned attempting to use James Turner as one of the representatives for this class, since he received narcotics while at the Detention Center.

Plaintiffs dispute Defendants' characterization of its policy and its execution. Yet they also represent that if this is the case and narcotics are sometimes prescribed, the written policy states that the final decision on whether to do so is left to the jailer, a non-medical person, and that this is constitutionally impermissible. This further representation is troubling because this contention is not expressed in their proposed definition. Thus, what Plaintiffs have done in their Renewed Motion is put forward a definition, then offer in

-19-

reply filings that if this definition is not acceptable, the last clause can be removed. Then, at oral argument they offered yet another version of the definition, by challenging the Detention Center's placement of narcotic prescription authority in non-medical personnel. Again, the Court is simply not inclined at this stage to formulate a class definition for Plaintiffs that they themselves have been unable to formulate and support under Rule 23.

As earlier noted, the companion threshold inquiry to whether there is a defined class is whether the Named Plaintiffs are members of that class. Frankly, Named Plaintiffs could probably satisfy this standard, but only because, as just discussed, the definitions for both classes are so poorly framed and overly broad. But even this conclusion is not straightforward. Plaintiffs have come forth with few details in their Third Amended Complaint and Renewed Motion on how each of them fit within one or both of the classes proposed, and the information that is in the record reinforces the individualized incarceration circumstances to which each of the Named Plaintiffs was subjected.[9]

---

[9]Accepting Plaintiffs' allegations as true for purposes of the motion, for the "failure to protect" class, Plaintiff James Turner alleges that, after being removed from a cell where he was safe when the Center decided to desegregate two cells, he warned deputy guards his life was in danger due to threats of physical harm by cell mates. He was then assaulted so severely that he required a facial implant. Plaintiffs Jasmine Davis and Venessa Berry allege they were placed in cells with several men, then sexually harassed, abused, ridiculed, embarrassed, humiliated and suffered emotional distress.

Three of the Named Plaintiffs are listed as representatives for both the "failure to protect" and "no narcotics" classes. They are Dennis Stephens, Tonya Sunbom, and Timothy Dowell. Stephens complains that he suffered burns on his face and neck for which he was subsequently denied medical care, after another inmate started a fire that was permitted to burn out of control because there were insufficient guards on duty to promptly respond and extinguish it. Tonya Sunbom alleges she was knowingly placed in a cell with a known dangerous inmate who later assaulted her, necessitating stitches, and was placed in isolation until her injuries healed then asked by Defendants to lie about how she received them. Timothy Dowell alleges he warned guards his life was in danger following threats from another inmate, who then assaulted him to such an extent that he required 12 staples in his head. He was taken to the ER but alleges being denied treatment upon return to the Center. He also offered by affidavit that he overheard a guard tell the ER physician that the Detention Center is a non-narcotic facility. (See Doc. #161, Ex. I).

There are four additional Plaintiffs named as representatives for the "no narcotics" class. Bobbi Riggs Gibson alleges upon entry she was denied prescription medication that she had been

-20-

As the footnoted materials evidence, each of the Named Plaintiff's circumstances is unique, even accepting their description of the conditions to which they were subjected. Plaintiffs Teegarden and Dowell are the only Plaintiffs offering affidavits in support of their class definition and membership therein. None of the other Named Plaintiffs have provided affidavits or specifics on how they fall within the class definition being sought. At a minimum, each should show they had been prescribed narcotics prior to intake and refused them, or should have been prescribed them while at the Detention Center.[10]

In summary, as it would be impossible to definitely identify the members of each class without individualized fact-finding and litigation, the Court finds that Plaintiffs have failed to define a certifiable class. In addition, they have failed to evidence that each Named Plaintiff identified by them as belonging to the class does so fall within the class definition, or to the extent they do, it is only because the class as defined is ambiguous and overly broad. Despite these fatal deficiencies in maintaining a class action, the Court will nevertheless proceed with application of Rule 23(a), briefly addressing the other certification requirements, to further consider the merits of Plaintiffs' class certification request. Had Plaintiffs survived the hurdles of defining a class, each of these Rule 23(a)

---

taking for years, and then over-medicated with other medications by the staff. Plaintiff Alan Taylor alleges he has an obvious disability requiring medication, but his disability was handled poorly by staff and he was treated improperly. Plaintiff George Foltz alleges he was at the Detention Center many years, that his need for psychological care was obvious but ignored by staff. Finally, Plaintiff John Teegarden alleges that upon intake he was denied his regularly prescribed narcotic medications for his muscular dystrophy and told the Center is a non-narcotic facility.

[10]Of course, this is without considering the factual disputes Defendants have with respect to each Plaintiff's purported situation. That information is not set forth nor examined here, as the Court accepts the Plaintiffs' allegations in their Complaint as true for purposes of considering their motion.

prerequisites would have had to be met before their classes could be certified.  *In re AMS,* 75 F.3d at 1079.

### 3.    "Rigorous Analysis" of the Rule 23(a) Factors

### (a)    Numerosity

Commonly referred to as the numerosity requirement, Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "Impracticability" depends upon all the circumstances of the case.  *Cash v. Swifton Land Corp.,* 434 F.2d 569, 571 (6th Cir. 1970).  Determining numerosity does not require adherence to a strict numerical formula.  *Gen. Tel. Co. v. EEOC,* 446 U.S. 318, 330 (1980) (finding that "[t]he numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations").  While no specific minimum number of alleged class members is required, Plaintiffs must demonstrate the existence of the numbers of persons they purport to represent.  *Gevedon v. Purdue Pharma*, 212 F.R.D. 333, 337 (E.D. Ky. 2002).  In making this determination, the Court may consider "reasonable inferences drawn from facts before it." *Id.; Senter,* 532 F.2d at 523.  There is a general "rule of thumb" that forty potential class members is enough to make joinder of plaintiffs impracticable.  *Allen v. Leis,* 204 F.R.D. 401, 406 (S.D. Ohio 2001).

With respect to the "failure to protect" class, Plaintiffs rely primarily upon two sources of information from which to infer class membership is so numerous as to make joinder impractical.  One, they point to the deposition testimony of a former Detention Center law enforcement employee that, continuing until at least May of 2005, the Center did not classify and therefore did not protect prisoners, which would in turn impact a significant number of individuals given this lack of classification was a custom and practice of the

Center and not an intermittent occurrence. (*See* Doc. #161, Ex. B-1).  Two, they point out that discovery has produced over eighty reported incidents of fights, inmate assaults, and sexual misconduct at the Detention Center for the two-year period from August, 2004, to September, 2006. (*See* Doc. #161, Ex. D-1).  Accepting this information at face value, Plaintiffs have at least identified a large enough number of proposed class members to determine that joinder of all members would be impracticable.

Of course, the difficulty with accepting this information at face value is that the defects in Plaintiffs' proposed class definition are what give rise to this numerosity.  The breadth of including persons subjected to "assaults, threats, or the wanton and unnecessary infliction of physical and emotional pain and suffering" is obvious.  As noted, there were 88 *reported* incidents alone in a two-year period, let alone those incidents *not* reported.  But this number says nothing about the related requirement of the harm having occurred from improper classification or a failure to protect.  The extent to which the reported or all of the other unreported incidents are reduced in number when the Defendants' classification or protection failure is factored in is unknown, and one of the reasons why the class definition is defective.  That an inmate suffered an "assault, a threat, or infliction of physical and emotional pain and suffering" does not mean those incidents involved constitutional deprivations as alleged in the failure to protect class such that each of those persons involved in those incidents would be a class member.  This defect in the definition renders it virtually impossible to effectively consider numerosity.

Neither is the Court persuaded that the "no narcotics" class would be of sufficient size to warrant certification.  There are several hurdles to Plaintiffs evidencing even by inference that a class membership of sufficient size exists such that joinder would be

impracticable.  In briefing, Plaintiffs made a conclusory statement that the Detention Center "had in place for some time a 'no narcotics' policy applied blanketly to all inmates regardless of the consequences to their health and well-being." (Doc. #161, at pp. 14-15) They rely upon their contention of blanket application as suggesting that many inmates were affected by application of the policy.  At oral argument, Plaintiffs' counsel indicated that approximately 30 medical incidents have been reported for the August, 2004 to September, 2006 period (see Doc. #161, Ex. D-1).  Plaintiffs emphasize that these 30 include 2 attempted suicides and 1 unexplained death.  While tragic, that these three would be included in the class as defined is not obvious.

As previously discussed, it was also realized at oral argument that neither of the originally Named Plaintiffs is a representative for this proposed class.  Therefore, the class period runs not from 2004, but rather from April of 2005, one year prior to the filing of the First Amended Complaint.  This, of course, reduces the number of potential class members based upon an assessment of these 30 reports, as the reports for almost one year must be removed.  Moreover, if the class definition is modified as Plaintiffs suggest so as to survive definitional analysis, essentially one-half of the definition has been removed.  From the Court's review of Exhibit D-1, approximately 11 of the reported medical incidents occurred prior to April of 2005.  And, in theory, were the class definition to be modified as Plaintiffs suggest so that it would survive definitional analysis, essentially one-half of the definition has been removed.  In reality, this is likely not an appropriate conclusion because a review of the actual reported medical incidents evidences little correlation to the class definition as proposed.

Finally, Plaintiffs rely upon cases finding numerosity to exist where blanket application of policies was being challenged.  *See Cudnik v. Kreiger,* 392 F. Supp. 305 (N.D. Ohio 1974) and *Eddleman v. Jefferson Co., Ky.,* 1996 WL 495013 (6th Cir.) (unpublished table decision).  Both of these cases are distinguishable.  *Eddleman* involved a challenge to a strip-search policy, which policy applied to every inmate coming in to the facility.  Here, only a percentage of the total inmate population housed at the Detention Center would be individuals admitted at a time when they were then-receiving lawfully prescribed narcotic medication at the time of admission.  And what that percentage might be would be speculative, at best.  *Cudnik* involved a challenge to a policy of denying methadone treatment to detainees.  The trial court was presented with evidence of the average jail population (450 inmates), the high turnover rate at the jail, and that at any given time there are approximately 35 methadone addicts housed there.  *Cudnik*, 392 F. Supp. at 310.  However, Plaintiffs have come forward with no such evidence here, which evidence might then be used to support an inference of numerosity.

While "[t]he exact number of class members need not be pleaded or proved," *Cwiak v. Flint Ink Corp.,* 186 F.R.D. 494, 496 (N.D. Ill. 1999), ultimately, impracticality of joinder must be positively shown and cannot be speculative.  *Golden v. City of Columbus,* 404 F.3d 950, 966 (6th Cir.), *cert. denied,* 546 U.S. 1032 (2005); *see also* Wright & Miller, *supra,* § 1762.  Plaintiffs have not shown it here with respect to the "no narcotics" class.  As Plaintiffs correctly note in their memorandum, class membership deemed to satisfy numerosity has covered a wide range; understandably it turns upon the circumstances of each case.  The type of number Plaintiffs' evidence even reasonably suggests simply is not adequate to persuade the Court that joining each potential class member as a named

-25-

plaintiff would be impractical.  *See Roman v. ESB, Inc.,* 550 F.2d 1343 (4th Cir. 1976) (denied class because, among other things, numerosity not satisfied).  The Court cannot rely on speculation or conclusory allegations of Plaintiffs.  They must "show some evidence of or reasonably estimate the number of class members."  *Schwartz v. Upper Deck,* 183 F.R.D. 672 (S.D. Ca. 1999); *Sims v. Parke Davis & Co.,* 334 F. Supp. 774, 781 (E.D. Mich.) ("[s]peculation cannot be used to establish that a prospective class is so numerous as to make joinder impracticable"), *aff'd,* 453 F.2d 1259 (6th Cir. 1971), *cert. denied,* 405 U.S. 978 (1972).  In *Sims,* for example, the only information provided to the court about class size was a comment that the class "would probably contain between 70 and 200 persons." *Id.*  Since plaintiffs had failed to allege the approximate class size, and since the estimate provided was not supported by any evidence, the court refused to certify the class. Similarly, the Plaintiffs' evidence and arguments here are of little import to the numerosity determination.

### (b)    Commonality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class."  In *General Telephone Co. v. Falcon*, the Supreme Court noted that class actions may be appropriate where "the issues involved are common to the class as a whole and where they turn on questions of law applicable in the same manner to each member of the class" such that the common issue may be litigated for all in an "economical fashion." *Falcon,* 457 U.S. at 155 (citations omitted).

While there need only be one common issue, that issue must not be at too great a level of generalization or abstractness.  *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir.)(*en banc*), *cert. denied,* 524 U.S. 923 (1998).  This requirement is qualitative rather

than quantitative; in other words, there need be only one issue common to the class. *In re AMS,* 75 F.3d at 1080. As the Sixth Circuit has stated, "It is not every common question that will suffice [to show commonality], however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality.  What we are looking for is a common issue the resolution of which will advance the litigation." *Sprague*, 133 F.3d at 397.

The commonality requirement is satisfied "as long as the members of the class have allegedly been affected by a *general* policy of the defendant and the general policy is the focus of the litigation."  *Day v. NLO, Inc.,* 144 F.R.D. 330, 333 (S.D. Ohio 1992) (quotation omitted).  While there need be only a single question of law or fact, it should be common to *all* members of the class.  *In re AMS,* 75 F.3d at 1080.  "[T]he mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible."  *Sterling,* 855 F.2d at 1197.

In this case, the foundation of Plaintiffs' claims rests upon an alleged general overriding common feature of purposeful overcrowding, underfunding and understaffing at the jail, in combination with staff that are overworked, undertrained, and underpaid.  Legal and factual questions such as these are too general and abstract to satisfy the commonality requirement.  *Sprague,* 133 F.3d at 397.

More specifically, Plaintiffs by their classes seek to halt allegedly illegal policies and/or practices to which all inmates are subject; namely, lack of a classification scheme upon entry/failure to protect once entered and deliberate indifference to serious medical

needs by denying narcotic medication.  Plaintiffs allege there are other questions common to them and the putative class members.  They include –

For the "failure to protect" class:

- whether inmates were properly classified upon entering the Center or reclassified later as they became known as "high risk inmates"

- whether adequate guards or supervision was available to handle the large number of inmates and/or obvious overcrowding

- whether the Center was operating in excess of its capacity as a jail and/or operating in excess of its capacity for the number of employees on duty at the time

- whether the number of beds available within the Center for the inmates was exceeded simply to finance the Center in lieu of providing proper care for the inmates

- whether inmates were adequately protected from other inmates

- whether the guards and/or staff members could have prevented injuries from occurring to inmates

- whether guards intentionally, recklessly or with deliberate indifference placed inmates/prisoners in harms way by placing them in certain cells or with certain inmates that they knew were a risk to others

- whether guards or staff members should have had a continuing duty to properly classify prisoners or inmates once they became violent prior to their entry into the Center or while they remained within the Center

- whether the inmates were properly monitored while in their cells

- whether the Center violated its own policies and procedures in relation to the care and protection of inmates and their constitutional rights

For the "no narcotics" class:

- whether inmates who had been lawfully prescribed narcotic medication by duly licensed treating physicians, or who needed narcotic medication due to illnesses or injuries that occurred at the Center, were denied such medication as a consequence of the Center's "no narcotics" policy

-28-

- whether the Center maintained adequate medical records of inmates requiring medical care whether past, present, or future

- whether inmates were denied necessary medication

- whether deliberate indifference was shown to exist in relation to medical treatment of inmates

- whether Center guards or inmates, rather than properly trained medical personnel, made decisions regarding appropriate medications

- whether inmates were given improper medications for weeks and/or months at a time despite having serious diseases, illnesses and/or sicknesses

Ordinarily, whether Defendants' alleged policies and/or practices for each class violate the Eighth Amendment would be a question common to Plaintiffs' proposed classes. What Defendants' policies and practices are with respect to classifying/protecting inmates and denial of narcotics should be the only fact question to be answered; whether those practices/policies are unconstitutional essentially should be the only legal question. What we have instead are a number of purported "common" questions from Plaintiffs. Some of these questions are simply too general and overlap Plaintiffs' "overcrowding, underfunding and understaffing" big-picture theory of their case (e.g., are inmates adequately protected from other inmates? was deliberate indifference shown in relation to medical treatment of inmates?). And, while there are legal questions for each group, the questions are multiple and not common among *all* members because the definitions are so broad. Thus, the legal questions raised by Plaintiffs and their broadly proposed class are not "common" for the purposes of maintaining a class action. Plaintiffs are too focused on the harm to which they were subjected without focusing on the alleged common manner they were subjected to policies/procedures that resulted in that harm. For example, Plaintiff Turner suffered injuries that he describes as being from an assault and Defendants describe as being

-29-

caused by a fight that he voluntarily engaged in.  Plaintiffs rely upon the twenty pages of incidents reported as evidencing the commonality needed for establishing a class.  But review of those incidents fails to reveal a common thread to establish both a sufficient group for numerosity purposes and the required commonality to make a class an effective method.  Each incident occurred under different circumstances, with different inmates and Detention Center personnel.

Plaintiffs' failure to classify/protect claims are not unlike many individual actions pursued by prisoners every day in courts throughout the country and do not become class actions simply because there may be other plaintiffs with similar claims or a common defendant.  More specifically, is each Plaintiff's situation unique and distinct from other inmates and potential class members?  And are there defenses to some of the named Plaintiffs and proposed class members' causes of action that will need to be individually analyzed?  Simply put, the intense factual nature of Plaintiffs' or the class members' claims prevent a finding of commonality for purposes of Rule 23(a)(2).  Among the proposed class members, there is a broad variety of individual claims as to both liability and damages.  And causation is not uniform among class members.  Any harm allegedly suffered by a member of the class may be due to a number of individual factors such as placement, attitude and demeanor, Plaintiff's own conduct and whether an issue is presented of provocation for the "failure to protect" class.  Moreover, each Plaintiff would have to show a causative link between physical injuries suffered and that those injuries were caused by Defendants' conduct in failing to protect him.

Similarly, commonality for the "no narcotics" class has not been shown.  Discerning what action/inaction Plaintiffs allege as rising to the constitutional level of deliberate

indifference to serious medical needs, pursuant to *Estelle v. Gamble,* 429 U.S. 97 (1976), is not straightforward.  Is it the alleged policy of prohibiting and refusing to provide narcotics at all?  Or is it the alleged failure to effectively treat known medical conditions/injuries?  Or is it a policy of prohibiting and refusing to provide narcotics already lawfully prescribed by a treating physician?  Or is it a policy of prohibiting and refusing to provide narcotics to effectively treat known medical conditions/injuries?  Or is it all of these?

Employing the suggested "more limited" definition does not fare any better.  All inmate records must be examined to see if upon intake the individual had an unexpired prescription for a narcotic from a licensed physician.  If so, records would have to be examined to see if the inmate sought to continue the narcotic, or never sought to do so.  If the inmate did seek to continue the narcotic, whether that request was denied would have to be determined.  Although Plaintiffs infer the query would stop there to determine class membership, it would not, unless the Center did in fact have a blanket policy of no narcotics, regardless of condition or need.  If it did not have such a policy, the inquiry would continue, in order to examine the various reasons why the narcotic was denied, such as prior addiction or abuse history or that the jailer has to approve, or that use of narcotics to treat the condition on intake was not medically necessary.

While there may be some common questions regarding the Defendants' alleged actions or inactions in classifying and protecting inmates and in dispensing lawfully prescribed narcotics, the Court is not persuaded that requisite Rule 23(a) commonality has been shown.  Any common questions for each class apply to all Named Plaintiffs only because the questions are so generic virtually every inmate has an interest in the question's answer.  Plaintiffs have not identified a single particularized question of law that

will advance this litigation and is applicable to *all* Named Plaintiffs and all putative members of each class. Simply put, just because a named plaintiff can make a showing of failure to protect or no narcotics as to that plaintiff, this does not necessarily bridge the gap of showing plaintiff was so affected because of class-wide grounds. For all of these reasons, the Court concludes that Plaintiffs' proposed classes do not further the purpose of the commonality requirement by providing a means for saving resources for the Court and the parties and resolving the issue in an economical fashion. *See In re AMS,* 75 F.3d at 1080.

### (c)    Typicality

Rule 23(a)(3) requires that the claims of the class representatives must be typical of the claims of the class. "[C]ommonality and typicality requirements of Rule 23(a) tend to merge." *Ball v. Union Carbide Corp.,* 385 F.3d 713, 728 (6th Cir. 2004) (quoting *Rutherford v. City of Cleveland,* 137 F.3d 905, 909 (6th Cir. 1998)). There should be a uniform, common question of law to be adjudicated, then the named plaintiff should typify the person who has been subjected to that common question.

"[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re AMS,* 75 F.3d at 1082 (citing 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions,* § 3.13, at 3-75, 76 (3d ed. 1992)).

> Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.... A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members.

*Sprague,* 133 F.3d at 399 (quoting *In re AMS,* 75 F.3d at 1082)).   "The premise may be simply stated: as goes the claims of the named plaintiff[s], so go the claims of the class." *Id.* Moreover, the class representatives' interests must be aligned with those of the putative class and the pursuit of their claims must also advance the interest of the class.   *In re AMS,* 75 F.3d at 1082.   The representative must be a member of the class she purports to represent. *East Texas Motor Freight Sys., Inc.,* 431 U.S. at 403.

The proof required for Named Plaintiffs' own cases to prevail should be that necessary for the putative class to prevail.   Such is not the case here.   Plaintiffs avoid presenting any proof on how their claims are typical of the claims of the proposed class. Examining the individual allegations asserted by the "failure to protect" Plaintiffs in their Complaint, a causative link between the harm and injury they allege and that harm/injury being caused by a standardized policy of Defendants of failing to classify inmates or standardized policy of failing to protect inmates is missing.   Rather, the Court is persuaded, at least in part, by Defendants' argument that Plaintiffs are seeking to represent a class of persons well beyond that which they bring themselves.

In this case, there will certainly be significant factual differences arising between class members who are also relying upon various legal theories for liability.   Because of the wide variety of potential factual scenarios that would certainly be present if the Court certified the proposed classes, the Court can easily envision that some of the class members' claims would warrant different outcomes than others depending upon whether the harm proven was from an unconstitutional policy of Defendants and, if so, which one. This makes it impossible for Plaintiffs to establish that their claims are typical for purposes of Rule 23(a)(3).

In sum, Plaintiffs' proposed classes fail Rule 23(a)(3)'s "typicality" requirement for many of the same reasons the Court has found insufficient commonality under Rule 23(a)(2).  The highly individualized claims and legal theories sought to be certified, and the defenses to those claims are the death knell to Plaintiffs' assertions that their claims are typical of each of the proposed classes.

### (d)     Adequacy of Representation

Rule 23(a)(4) requires that (1) the class representative have common interests with the unnamed members of the class, and (2) it appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.  *Senter,* 532 F.2d at 524-25; *see also Cross v. National Trust Life Ins. Co.,* 553 F.2d 1026 (6th Cir.1977) (The rule tests "whether there is any antagonism between the interests of the plaintiffs and other members of the class they seek to represent" and "the experience of the counsel for the plaintiffs.") This adequacy requirement overlaps with the typicality requirement "because in the absence of typical claims, the class representative has no incentive to pursue the claims of the other class members."  *In re AMS,* 75 F.3d at 1083.

Adequacy of representation has not and cannot be shown in this case because, as discussed immediately above, typicality has not been established.  Named Plaintiffs for each class simply have too many individual issues with which to be concerned to advance adequately the interests of each putative class.  Moreover, Plaintiffs have not formally represented that they understand the obligations of a class representative and are prepared to undertake them, and that they will fairly and adequately protect the interests of the class.  As Plaintiffs have merely repeated the language of Rule 23(a)(4) in their memorandum filing, the Court concludes an extensive review of the "adequacy" prong is

unnecessary.[11]  Plaintiffs have simply failed to offer any facts beyond a mere recitation of the rule.  As Plaintiffs have not provided factual or other supporting allegations on this element, the Court cannot conclude Plaintiffs have adequately demonstrated that they will protect the interests of the class.

In summary as to the Rule 23(a) factors, Plaintiffs simply have not made an adequate showing of the appropriateness of the class action process to the depth and breadth of the alleged wrongs sought to be remedied here.  This being said, the Court recognizes the important role class actions play in the access to and administration of our legal system, serving to challenge what can be wrongful conduct with widespread consequences that would otherwise be left unchecked without the class action device.  However, the effectiveness of the process must lie, at least in part, in its correct and focused application.

Because Plaintiffs have failed to meet their burden of establishing the Rule 23(a) prerequisites for a class action under Rule 23, the Court does not need to engage in an analysis under Rule 23(b).  However, a few comments thereon are in order.

### 4.   Civil Rule 23(b) Considerations

Even if each class were to satisfy all four of the Rule 23(a) prerequisites, the class must also satisfy at least one subsection of Rule 23(b).  *Stout v. J.D. Byrider,* 228 F.3d 709,

---

[11]Adequacy of representation also calls for consideration of class counsel's qualifications and competency to conduct the proposed litigation.  *In re AMS,* 75 F.3d at 1083.  Defendants protest generally that the chaos and lack of clarity in this case evidence the lack of competency in representation.  However, Plaintiffs' initial counsel has a familiarity with the Detention Center and the circumstances surrounding its operation based upon his prior individual  lawsuits against Defendant, and additional counsel experienced in class litigation and prison litigation in particular was also brought in.  Because Plaintiffs are unable to satisfy the commonality and typicality requirements of Rule 23(a)(2) & (3), the Court need not make any further inquiry into the qualifications of Plaintiffs' counsel with respect to prosecuting this class action.

717 (6th Cir. 2000), *cert. denied,* 531 U.S. 1148 (2001); *Sprague,* 133 F.3d at 397.  In this case, Plaintiffs seek certification of the "failure to protect" and "no narcotics" classes under all three subsections of Rule 23(b).

Rule 23(b)(1) is proper where prosecution of separate actions would create inconsistent or varying adjudications or adjudications that would be dispositive of the interests of other persons.  Plaintiffs represent that proof regarding liability will be virtually identical for all class members but as previously discussed in this Opinion, this is not the case.  Virtually every member's circumstances will have to be individually reviewed to see if that person arguably falls within the alleged unconstitutional deprivation that is the subject of that class, which deprivations are also not clear because of the problems with the proposed class definition.  If they somehow do, each individual's situation would still have to be examined to determine if defenses apply or if there were other contributing circumstances.  Thus, since essentially each claim is personal and unique to the individual, the risk of creating "inconsistent or varying adjudications" is not a concern.

To qualify for certification as a Rule 23(b)(2) class, the class must demonstrate that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  The relief sought is primarily injunctive or declaratory.  *Alexander v. Ford Motor Co.,* 204 F.R.D. 314, 320 (E.D. Mich. 2001).  For (b)(2) not every member of the class must have been damaged by defendants' allegedly wrongful conduct, nor is the court called upon to determine predominance of common questions of law or fact or that proceeding as a class action is the superior method of adjudication.  *Little Caesar Enter., Inc. v. Smith,* 172 F.R.D. 238, 267 (E.D. Mich. 1997).

The advisory committee notes reflect that subsection (b)(2) was intended to reach situations where defendants act or refuse to act with respect to a class, and adjudicating the legality of that behavior is appropriate. However, the action or inaction must be based on grounds that have general application to the class. Fed. R. Civ. P. 23 advisory com. note.

Setting aside the issue of how the Named Plaintiffs' incarceration status factors into their request to certify a (b)(2) class for declaratory and injunctive relief, class litigation under (b)(2) is often the form employed in cases aimed at prison conditions. Indeed, virtually all of the cases relied upon by Plaintiffs in support of certification of the two classes proposed here involved class certifications under (b)(2).[12] But here, the challenges to the jail's operation as failing to satisfy constitutional standards are so numerous and varied, the Court is unable to conclude adjudicating the merits of declaratory relief would have general application to the particular classes. In addition, that Plaintiffs have a strong interest in procuring injunctive relief and are thereby motivated to advance the interests of a (b)(2) class has not been demonstrated. Their Third Amended Complaint states that Plaintiffs seek both damages and unspecified injunctive relief (Doc. #150, ¶ 17), but the Complaint's prayer for relief seeks various forms of monetary relief without expressing the need or desire for an injunction. And while Plaintiffs offer in their motion filing that a Rule 23(b)(2) class is warranted because Defendants have not stopped engaging in unconstitutional

---

[12]Procedurally, the bulk of those cases cited by Plaintiffs were before the court in various stages on the merits of liability; only a few of the cases were before the court on the actual motion for class certification. And in many of the cases the (b)(2) class was certified by agreement or the defendant did not contest certification. The few decisions involving the issue of class certification specifically were all certification requests under Rule 23(b)(2), and involved class definitions very different from those proposed herein.

treatment of inmates despite the Department of Justice investigation and report, they have failed to come forth with evidence that a sufficient number of inmates have been impacted by the same commonly applied unconstitutional policy that pursuit of a declaratory judgment via the class action mechanism is warranted.

Finally, Plaintiffs also sought certification of a (b)(3) class.  Rule 23(b)(3) provides that an action may be maintained as a class action if the subsection (a) prerequisites are satisfied and if the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

One matter pertinent to the findings, among others, is the difficulty likely to be encountered in the management of this type of class action.  Fed. R. Civ. P. 23(b)(3)(D). Certification of this type of class requires individual notice to putative class members, a task anything but straightforward due to the inadequacies of the class definition as previously addressed.  Moreover, damages for classes certified under this subsection typically would be in the nature of monetary damages, as is prayed for by the Plaintiffs here.  In this case, however, PLRA issues would once again surface if the class were to include present inmates seeking monetary damages under circumstances where physical injury was not evident.[13]

---

[13]The potentially relevant section of the PLRA states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e). "This statute applies to Eighth Amendment claims for emotional or mental damages" such as are being sought by Plaintiffs in the instant matter.  *See Jarriett v. Wilson,* 162 Fed. Appx. 394, 400 (6th Cir. 2005)(unpublished).  What constitutes a sufficient "physical injury" so as to recover pain and suffering damages has been the subject of judicial interpretation.  *Id.* (discussing parameters of *de minimis* injuries not qualifying under the statute; *see also e.g., Leon v. Johnson,* 96 F. Supp. 2d

There is a parallel between Rule 23(a)(2)'s commonality requirement and Rule 23(b)(3) in that both require that common questions be examined.  However, (b)(3) requires that the common issues predominate over individual ones.  *In re AMS,* 75 F.3d at 1083.

Protracted analysis of this point is unnecessary.  Certifying a (b)(3) for "failure to protect" and "no narcotics" would not be appropriate, in part because determining membership in each class would involve extensive individual fact-finding.  And neither the predominance nor superiority requirements are met here.  At best, there may be common issues of fact and law as to the existence and legality of Defendants' policies and practices.  But these policies and practices are alleged so broadly and so generally that these fact and legal questions are too numerous and too common to be of practical benefit for discerning a common thread for each class.  More importantly for certification of this particular type of class, the individual aspects of both claims and defenses for each of the two proposed classes would be extensive.  Thus, the predominance of common versus individual issues simply has not been established by Plaintiffs.  Therefore, certification under subsection (b)(3) is also not appropriate.

### **Conclusion**

In conclusion, and for the reasons stated herein, **IT IS ORDERED** that:

(1)      Defendants' Motion to Dismiss (Doc. #163) is hereby **granted in part** in that the claims of Plaintiffs James Cormican, Odas Cutlip, and Sean Raines are hereby **dismissed with prejudice.**  Defendants' motion in all other respects is hereby **denied;**

---

244, 248 (W.D.N.Y. 2000) (denial of medication *de minimis* only and not a "physical injury"), *Williams v. Smith,* 2006 WL 938980, *2 (W.D. Ky. 2006)(denial of medication resulted in no physical injury).

(2)     Plaintiffs' Renewed Motion for Class Certification (Doc. #161) is hereby **denied;** and,

(3)     **Within ten (10) days** from the date of this Order, the parties shall file a status report indicating whether that party has filed a Civil Rule 23(f) petition for interlocutory appeal of the Court's rulings with the Sixth Circuit Court of Appeals.

This 26th day of March, 2008.

Signed By:

*David L. Bunning*

United States District Judge

G:\DATA\Opinions\2-05-148-ClassCert.wpd