**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON**

**CIVIL ACTION NO. 05-148-DLB**

**BOBBIE GIBSON-RIGGS, ET AL.**                                        **PLAINTIFFS**

vs.                 <u>**MEMORANDUM OPINION & ORDER**</u>

**GRANT COUNTY DETENTION CENTER, ET AL.**                   **DEFENDANTS**

\*   \*   \*   \*   \*   \*   \*

Plaintiffs, Bobbie Gibson-Riggs, Alan Taylor, and John Teegarden, commenced this § 1983 suit against the Grant County Detention Center (GCDC), the Grant County Fiscal Court, and the Grant County Jailer after they were denied access to prescribed psychotropics and narcotic pain medication while incarcerated at GCDC. Plaintiffs allege that Defendants' refusal to provide them with lawfully-prescribed medications violated their rights under the Eighth Amendment and Kentucky state law.

This matter is currently before the Court on Defendants' Motions for Summary Judgment (Docs. #346, 347, 348). All three motions have been fully briefed (Docs. #356, 358), and the matter is now ripe for review. For the reasons set forth below, because Plaintiffs' disagreement with the medical treatment provided to them at GCDC is insufficient to state a claim under § 1983, Defendants' Motions for Summary Judgment are **granted**.

### I.     FACTUAL AND PROCEDURAL BACKGROUND

The Grant County Detention Center is a 345 bed correctional facility for men and woman located in Williamstown, Kentucky. As a subdivision of Grant County, GCDC is

1

subject to the authority of the Grant County Fiscal Court ("Fiscal Court"), which annually reviews and approves Jail policy. The day-to-day operations of GCDC are overseen by the Grant County Jailer, Steven L. Kellam. Kellam is responsible for "the care and custody of inmates," including medical care.

Prior to May 9, 2005, medical services at GCDC were provided by Dr. Troy Ashcraft and several nurses, whose services were guided by GCDC's published "Policy and Procedures." Dr. Ashcraft has testified that he does not remember the GCDC having a policy of not ordering or administering controlled substances to inmates. On May 9, 2005, the Fiscal Court entered into an agreement with Southern Health Partners, Inc. (SHP), whereby SHP would begin providing medical services for all GCDC inmates on July 1, 2005. Pursuant to this agreement, the GCDC "Policy and Procedures" were changed to reflect the jail's relationship with SHP. In particular, the section titled "Dispensing Medication" was changed to read: "Dispensing medications will be based upon the procedures set in place by medical contractor, Southern Health Partners." (Doc. #348, Ex. 5).

SHP's Drug Formulary sets forth that entity's policies and procedures for dispensing medications to inmates. (Doc. #348, Ex. 6) ("The SHP formulary is a list of medications considered by SHP professional staff and pharmacists to ensure high quality, cost-effective drug therapy for the population served."). A section titled "ORDERING OF CONTROLLED MEDICATION"[1] sets forth SHP's policy with regard to controlled substances: "The facility, as a general rule, will not order or administer controlled substances for detainees.

---

[1] Prior to October 2006, this section bore the title "NO NARCOTIC POLICY." (Doc. #348 at 4 n.1).

2

Alternatives to controlled substances will first be considered when choosing a medication for pain, headache, or cough. . . . When situations arise that the physician needs to prescribe a controlled medication, he will obtain the approval of the jail administrator." (Doc. #348, Ex. 6). Despite these restrictions, SHP policies emphasize that "[i]t is very important to note that **no** inmates should go without needed/prescribed medication." (Doc. #346, Ex. 6).

The record contains conflicting evidence as to whether SHP's restriction of controlled substances resulted in GCDC having an actual "no narcotics" policy. Nurses who worked at GCDC have testified that they believed the facility to be a "no narcotics" facility with a "no narcotics" policy. (Doc. #356, Exs. 9, 28, 29, 30). However, those nurses and other personnel have also testified that inmates are, albeit on rare occasions, administered narcotics if the jail physician determines that controlled substances are necessary for effective treatment. (Doc. #348, Exs. 27, 28, 29, 30, 31).[2] Plaintiffs' experts have testified that SHP's controlled substances policy has some "wiggle room" that provides doctors at GCDC with the discretion to prescribe narcotic medications. (Doc. #358, Exs. 3, 4). Likewise, Defendant Kellam has testified that the SHP policy is not a "no narcotics" policy. (Doc. #348, Ex. 1).

Plaintiffs have reviewed the records, and generated a chart of all the GCDC inmates who reported prescriptions for narcotic pain and/or psychotropic medications on admission to the jail between May 1 and September 1, 2005, and January 1 through May 1, 2007.

---

[2] Although Nurse Strong did not testify to this fact, Defendants have produced a document showing that she administered Hydrocodone, a narcotic, to inmates while working at GCDC. (Doc. #358, Ex. 5).

(Doc. #356, Ex. 31). Plaintiffs contend that of the nearly 300 inmates that entered the jail during this time period, only 21 received narcotic or psychotropic medications while incarcerated. In addition, Plaintiffs aver that most of those prescriptions were written in the two-month period before SHP began providing inmate medical care on July 1, 2005. In reply, Defendants assert that Plaintiffs' analysis of the medical and prison records is factually inaccurate. Defendants contend that, once duplicate entries are removed from Plaintiffs' chart, only 191 inmates remain on the list, and that 77 of those inmates received narcotic medication while incarcerated at GCDC.

### A.    John Teegarden

In November 2002, John Teegarden was diagnosed with "muscular dystrophy or facio-scapulo-humeral dysrophy, hypertension, anxiety, [and] depression." (Doc. #356. Ex. 1). To treat these conditions, Teegarden's physician, Dr. Craig Sanders, prescribed Toprol, Altace, and Aceon for his hypertension, Effexor for his depression, Valium for his anxiety, and Vicodin for his pain. In June 2006, Dr. Sanders replaced Teegarden's prescription for Vicodin with one for Percocet.

From January 10, 2007, to March 19, 2007, Teegarden was incarcerated at GCDC for a parole violation. When Teegarden was booked into GCDC, he informed the jail staff that he suffered from muscular dystrophy and had prescriptions for Lortab and Valium. In addition, Teegarden provided the name of his prescribing physician and pharmacy, and requested that a friend of his be called to bring his medications to the jail. The call was made, and Teegarden's medications were brought to the jail.

During booking, Teegarden was antsy and anxious, with labored breathing. He complained he could not warm up. Due to these symptoms, Teegarden was placed on

4

medical watch for four days. Teegarden's medical records indicate that, from the first day he was incarcerated, he was given Altace, Toprol, Effexor, Etodolac, and Sudafed to treat his various medical conditions. Later, Teegarden was placed on Visteril to help him detox off of Valium.

On January 11, 2007, Teegarden filled out an Inmate Sick Call Slip complaining of "glass in nose" and high blood pressure; however, he later refused to see a doctor. On January 24, 2007, Teegarden complained that he was not feeling well; jail medical staff checked his blood pressure, which was 160/118. Teegarden was administered Visteril and Clonidine - a blood pressure medication that can also be used to treat withdrawal from narcotics - after which his blood pressure dropped.

The following day Teegarden saw Dr. Ronald Waldridge, an SHP physician, for hypertension and chronic neck pain. During that visit, Teegarden's blood pressure was 168/103. In response, Dr. Waldridge increased Teegarden's prescription for Clonidine. In addition, Dr. Waldridge attempted to alleviate Teegarden's neck pain by ordering him to continue taking Etodolac, and adding a prescription for Percogesic.

Teegarden does not dispute the he received medications during this period of incarceration. In fact, he has testified that some members of the SHP staff worked hard to ensure that he received the medication prescribed for him by SHP physicians. Still, Teegarden stresses that there exists no evidence that he received narcotics while incarcerated at GCDC, and states that he was told by his doctors and nurses that GCDC was a no-narcotics facility.

After his release from GCDC on March 19, 2007, Teegarden entered a thirty-day inpatient drug treatment program. Following his completion of the program, Teegarden was

5

examined by Dr. Thor Tangvald on May 4, 2007.  Dr. Tangvald diagnosed Teegarden as suffering form generalized anxiety disorder, panic disorder, restless leg syndrome, hypertension, and muscular dystrophy, and prescribed various drug–including Valium and Percocet–to treat Teegarden's afflictions.

Teegarden was again incarcerated at GCDC for approximately two months beginning July 9, 2007.  Prison records indicate that the day after he entered GCDC, Teegarden was given Toprol, Ibuprofen, Crestor, Etodolac, Aspirin, and the psychotropic Effexor to treat his diagnosed medical conditions.  He continued to receive these medications throughout this period of incarceration.

Following his release on August 29, 2007, Teegarden visited Dr. Tangvald.  During this visit, Dr.Tangvald noted that Teegarden "didn't look . . . good," although he was unsure of the reason behind Teegarden's poor appearance.

### B.    Bobbie Gibson-Riggs

Bobbie Gibson-Riggs is a 48-year-old woman in the final stages of renal failure.  In addition, Gibson-Riggs suffers from chronic pain due to a car accident, anxiety, and depression.  In 2004, Gibson-Riggs' ailments were being treated with Klonopin, Roxicodone, and Lexapro.

Gibson-Riggs was incarcerated at GCDC from May 26, 2005 to August 22, 2005.  At booking, Gibson-Riggs informed GCDC staff that she had prescriptions for Klonopin and Oxycodone, and identified her prescribing physician.  The day after her admission to GCDC, Gibson-Riggs was examined by Nurse Gragg.  During her examination, Gibson-Riggs refused treatment – including medication and dialysis – and was unwilling to sign a treatment refusal form.

Gibson-Riggs arrived at GCDC with a supply of Oxycodone which jail staff administered to her until her supply ran out on May 30, 2005. On June 2, 2005, Dr, Ashcraft prescribed Gibson-Riggs the narcotics Vicodin or hydrocodone for her pain, and the psychotropics Lexapro and Klonopin for her anxiety and depression. Medical records indicate that Gibson-Riggs continued to receive Vicodin or hydrocodone until July 17, 2005; Dr. Ashcraft testified that he is unable to remember why her narcotics were discontinued on this date.

Gibson-Riggs does not dispute that she received various medications during the course of her incarceration.[3] She did, however, often complain of pain and other issues to GCDC staff, filing at least ten requests for medical attention. These requests did not go unheeded: Gibson-Riggs has testified that she saw Dr. Ashcraft "at least one a week, sometimes twice," and that she believes he "did everything in his power to help [her]." On August 22, 2005, Gibson-Riggs' medical conditions necessitated her removal from GCDC to Federal Medical Center Carswell in Forth Worth, Texas.

### C.    Alan Taylor

Alan Taylor suffers from various medical conditions, including cervical and lumbar spondylosis and chronic anxiety disorder. In 2005, Taylor's' physician, Dr. Gary Shearer, prescribed Lorcet to alleviate the pain resulting from Taylor's disc disease, and Xanax to lessen his chronic anxiety.

---

[3] Gibson-Riggs avers that many of her medications were discontinued on July 1, 2005, when SHP took over the provision of medical care at GCDC, and asserts that there is no evidence that she received any medication from July 17, 2005 until her transfer to FMC Carswell. This representation, however, is undercut by documentation provided by Defendants which shows that Gibson-Riggs continued to receive most of her medications through the end of July 2005. (Doc. #358, Ex. 1).

7

Taylor was incarcerated at GCDC from July 5, 2005 until September 1, 2005. At booking, Taylor represented to GCDC staff that he had current prescriptions for Atenolol, Zocor, Nitrostat, Xanax, Lorcet and Aspirin, and provided the name of his prescribing physician and pharmacy.[4] From July 6 through August 25, Taylor was placed on work release. He worked outside GCDC during the week, and was incarcerated on the weekends. Taylor contends that during this period, although he was able to self-administer his medications during the week, he was denied access to his drugs on the weekends.

On August 17, 2005, Taylor visited Dr. Shearer complaining of neck pain and headaches, and requesting prescription refills. Dr. Shearer noted that Taylor appeared to be "in good health," and renewed Taylor's prescriptions for Lorcet and Xanax. Four days later, Dr. Ashcraft verbally ordered that Aspirin, Nexium, Lipitor, and Atenolol be administered to Taylor during his weekend incarceration. SHP records show that Taylor was given these medications the day of Dr. Ashcraft's order.

Taylor was removed from the work release program on August 25, 2005. The following day he told SHP medical staff he was experiencing chest pains and shortness of breath, and complained that he had not received his prescribed medication for the past two days. In response, SHP staff attempted to give Taylor his medication; Taylor refused to take the pills, and was thereafter transported to the hospital.

---

[4] According to Defendants, Taylor never produced any evidence showing that he had a valid prescription at the time of booking, or that he ever provided his prescriptions to GCDC. Taylor contests this assertion through an affidavit in which he avers that he had a valid prescription for Xanax and Lorcet at the time he began his incarceration on July 5, 2005. To support his affidavit, Taylor produced medical records. However, these records do not establish that Taylor possessed valid prescriptions on July 5, 2005. Rather, the records only reflect that Taylor obtained prescriptions from Dr. Shearer on July 17, 2005 and August 17, 2005 – after Taylor was incarcerated at GCDC. The records do not indicate that Taylor had a valid prescription upon entering GCDC on July 5, 2005.

At St. Elizabeth Medical Center Taylor was diagnosed with noncardiac chest pain and bronchitis. The attending physician found that Taylor was "in no acute distress whatsoever," administered Aspirin and Vicodin, and provided Taylor with a prescription for Doxycycline, an antibiotic. Taylor was returned to GCDC that same night, and released a few days later on September 1, 2005.

Approximately two weeks after his release, Taylor visited Dr. Shearer and reported that he was experiencing less pain than he had in May 2005. Despite Taylor's self-reported improvement, he contends that there is no evidence establishing that he received any narcotic pain or psychotropic medication during his incarceration. This assertion is supported by the testimony of Nurse Lowery, who stated that she told Taylor that he could not have narcotic medication at GCDC because it is a "no-narcotic jail." Although the record does not establish that Taylor made any formal complaint regarding the medical care he received at GCDC, his wife sent a letter to Defendant Kellam complaining that Taylor was not receiving his medication on the weekends.

## II.   ANALYSIS

### A.   Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is not a genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court must view the evidence, and draw all reasonable inferences, in favor of the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The moving party bears the burden of showing the absence of any genuine issues

of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 465 U.S. at 586, it must produce evidence showing that a genuine issue remains, *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record as a whole, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

### B. Section 1983

Section 1983 authorizes "any citizen of the United States or other person within the jurisdiction thereof" to pursue "an action at law [or] a suit in equity" against "[e]very person who, under color of" state law, causes "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983. "Although '§1983 by itself does not protect anyone against anything[,]' the statute 'provides a remedy for deprivations of rights secured by the Constitution and laws of the United States . . . .'" *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1348 (6th Cir. 1992) (citations omitted). In order to state a claim under § 1983, a plaintiff must identify a right secured by the United States Constitution and a deprivation of that right by a person acting under color of law. *Russo v. City of Cincinnati,* 953 F.2d 1036, 1042 (6th Cir. 1992).

#### 1. Plaintiffs Have Failed to Establish an Eighth Amendment Violation

The Eighth Amendment prohibits prison officials from "unnecessarily and wantonly inflicting pain" on an inmate by acting with "deliberate indifference" toward the inmate's

serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). To establish liability against a prison official for denial of humane conditions of confinement, a plaintiff must demonstrate that the official was both aware of specific facts from which the inference could be drawn that plaintiff suffered from a serious medical need, and that the official–perceiving that need–deliberately failed to act. *Id.* at 837. Consequently, an allegation of inadequate medical treatment does not rise to the level of a constitutional violation: "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 105-06 (quotations omitted).

The Sixth Circuit Court of Appeals distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). In cases where, as here, a plaintiff "has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.").

Under the facts of this case, construed in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have failed to demonstrate that Defendants were deliberately

11

indifferent to their serious medical needs. To the contrary, the record establishes that all three Plaintiffs received ample medical care while incarcerated at GCDC. Each Plaintiff was examined by prison medical staff – in the cases of Teegarden and Gibson-Riggs multiple times – during their incarceration, and each received medical treatment and pain medication for their conditions. Indeed, both Teegarden and Gibson-Riggs received psychotropic medications during their incarceration, and Gibson-Riggs was administered the narcotic pain killers Vicodin and/or hydrocodone while at GCDC. Furthermore, Plaintiffs do not suggest that the non-narcotic pain medications they each received were inadequate to manage their pain, or that the medications they received to treat their mental health issues were inadequate to alleviate their symptoms. Rather, they assert that they were entitled to receive the specific narcotics and/or psychotropics prescribed by their outside treating physicians, and that their failure to receive those medications violated their Eighth Amendment rights. The Court disagrees. At best, Plaintiffs' allegations that they did not always receive their preferred prescribed medications sounds in negligence, which is not actionable under § 1983.

Consequently, Plaintiffs' claims amount to nothing more than a disagreement with the course of treatment they received at GCDC, which is not actionable under the Eighth Amendment. *White v. Correctional Med. Servs. Inc.*, 94 F. App'x 262, 264 (6th Cir. 2004) ("Although [plaintiff] did not receive the care he wanted, the conduct he alleged did not constitute a deliberate indifference to his medical needs."); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996) ("[D]ifferences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis or treatment are not enough to state a deliberate indifference claim." (citing *Westlake*, 537 F.2d at 860

12

n.5)).[5] Because Plaintiffs' disagreements with the medications provided them by GCDC are insufficient to state a cognizable constitutional claim, Defendants are entitled to summary judgment on Plaintiffs' federal constitutional claims.[6]

### C.     State Law Claims

The granting of summary judgment and consequent dismissal of Plaintiffs' § 1983 claims renders this Court's jurisdiction over the remaining state law claims solely supplemental under 28 U.S.C. § 1367.

"'Under 28 U.S.C. § 1367(c)(3), the district court may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original

---

[5] Although the Sixth Circuit Court of Appeals has yet to address the specific issue of whether prison officials evince deliberate indifference to an inmate's serious medical needs when they substitute non-narcotic pain medication for the narcotics prescribed by the inmate's outside treating physician, the Court notes that other courts that have considered such allegations of medication substitution have found them insufficient to establish liability under the Eighth Amendment. *See, e.g., Baez v. I.N.S.*, No. 06-30112, 2007 WL 2438311, at *2 (5th Cir. Aug. 22, 2007) (per curiam) (holding that substitution of non-narcotic pain medication for prescribed narcotics due to prison policy prohibiting narcotics failed to state a claim of deliberate indifference); *Huard v. Essex County Corr. Ctr.*, No. CIV.A. 08-120S, 2009 WL 1886050, at *3 (D.N.H. May 21, 2009) ("The disagreement concerning the use of narcotic pain medication is insufficient to state a claim under 42 U.S.C. § 1983); *Steele v. Weber*, No. CIV 06-4001, 2006 WL 3544719, at *7 (D.S.D. Dec. 8, 2006) ("Although plaintiff and his previous doctor . . . disagree with the Department of Corrections' refusal to allow inmates to use narcotic pain medications, mere disagreement with treatment decisions does not rise to the level of a constitutional violation." (quotations omitted)).

[6] Because the Court has found that Plaintiffs have failed to establish the existence of a constitutional violation, it need not decide the contested issue of whether Plaintiffs were denied narcotics and psychotropics due to a "policy or custom" of GCDC. *See Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009) ("Municipalities are liable for harms resulting from a constitutional violation *only* when the injury resulted from an 'implementation of [the municipality's] official policies or established customs.'" (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 708 (1978))).

Furthermore, the Court notes that even if Plaintiffs had been able to establish an Eighth Amendment violation, because the record is devoid of evidence that Defendant Kellam was directly involved in the provision of medical services to Plaintiffs, Defendant Kellam would be entitled to summary judgement on Plaintiffs' § 1983 claims brought against him in his individual capacity. *See McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006) ("Respondeat superior is not a proper basis for liability under § 1983.").

jurisdiction. If the federal claims are dismissed before trial, the state claims generally should be dismissed as well.'" *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) (quoting *Wojnicz v. Davis*, 80 F. App'x 382, 384-85 (6th Cir. 2003)); *see also*, *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims."); *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001) ("[T]he usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment."). Accordingly, Plaintiff's federal claims having been dismissed, the Court declines to exercise supplemental jurisdiction over their remaining state-law claims. *See* 28 U.S.C. § 1367(c)(3).

### III. CONCLUSION

Accordingly, for the reasons state herein, **IT IS ORDERED** as follows:

1. Plaintiffs' Motion for Leave to File Reference List and Exhibit 31 to Response to Defendants' Motion for Summary Judgment Under Seal (Doc. #357) is hereby **GRANTED**;

2. The Clerk of the Court shall immediately place Exhibit 31 to Plaintiff's Response to Defendants' Motion for Summary Judgment (Doc. #346) **UNDER SEAL**;

3. Plaintiffs' Motion for Oral Argument on Defendants' Motions for Summary Judgment (Doc. #359) is hereby **DENIED**;

4. Defendants' Motion for Summary Judgment on Claims of John Teegarden (Doc. #346), Motion for Summary Judgment on Claims of Bobbie Gibson-

    Riggs (Doc. #347), and Motion for Summary Judgment on Claims of Alan Taylor (Doc. #348) are hereby **GRANTED**;

5.    Plaintiffs' federal claims are hereby **DISMISSED WITH PREJUDICE**;

6.    The Court declines to exercise supplemental jurisdiction; therefore, Plaintiffs' state-law claims are hereby **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3);

7.    Plaintiff James R. Turner's claims are hereby **DISMISSED WITH PREJUDICE** as settled;[7]

8.    This matter is hereby **STRICKEN** from the docket of the Court, and

9.    A Judgment in favor of Defendants will be entered contemporaneously herewith.

This 18th day of March, 2010.



Signed By:
David L. Bunning
United States District Judge

G:\DATA\Opinions\Covington\2005\2-05-148-MSJ-MOO.wpd

---

[7] On April 13, 2009, based upon representation from Turner's counsel that "in reference to the individual case of Plaintiff, James Turner v. Grant County Detention Center, that case has been now settled effective April 9, 2009" (Doc. #338), Magistrate Judge J. Gregory Wehrman ordered counsel for Plaintiff James Turner to submit and agreed entry of dismissal by May 13, 2009. (Doc. #340). No such entry was ever filed.